FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 AUG 13  PM 4: 17

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **POSEIDON OIL PIPELINE COMPANY, L.L.C., ET AL.** | **CIVIL ACTION** |
| | **NO. 00-760 C/W 00-2154** |
| **VERSUS** | |
| | **SECTION "T"** |
| **TRANSOCEAN SEDCO FOREX, INC., ET AL.** | **MAGISTRATE 2** |

## JOINT MOTION TO EXCLUDE MARATHON OIL COMPANY'S PROFFERED "RESERVOIR DAMAGE" EXPERT TESTIMONY OF WAYMAN L. GORE, JR.

NOW INTO COURT, through undersigned counsel, comes Edison Chouest Offshore, L.L.C.,

Galliano Marine Service, L.L.C., Aker Marine Contractors, Inc., John E. Chance & Associates, Inc.,

Transocean Offshore (U.K.), Inc., Transocean Offshore Ventures, Inc., Transocean Offshore U.S.A,

Inc., and Transocean Deepwater Drilling, Inc. (collectively, the "Movants"), respectfully to move

this Honorable Court to exclude Marathon Oil Company's proffered "reservoir damage" expert

testimony of Wayman L. Gore, Jr., because it does not comport with the requirements for

admissibility set forth in Federal Rule of Evidence 702.

NO:99296792 1

Fee _____
Process _____
X Dktd _____
CtRmDep _____
Doc. No. _____

WHEREFORE, Edison Chouest Offshore, L.L.C. and Galliano Marine Service, L.L.C., Aker Marine Contractors, Inc., John E. Chance and Associates, Inc., Transocean Offshore (U.K.), Inc., Transocean Offshore Ventures, Inc., Transocean Offshore U.S.A, Inc., and Transocean Deepwater Drilling, Inc. (collectively, the "Movants") urge the Court to exclude the tendered expert testimony of Wayman Gore.

Respectfully submitted,

PHELPS DUNBAR LLP

By: _____

Robert P. McCleskey, Jr., T.A. (Bar No. 09151)
William J. Riviere (Bar No. 20593)
Thomas Kent Morrison (Bar No. 25802)
Evans Martin McLeod (Bar No. 24846)
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Facsimile: (504) 568-9130 or 9007

**COUNSEL FOR EDISON CHOUEST OFFSHORE, L.L.C. AND GALLIANO MARINE SERVICE, LLC**

MAHTOOK & LAFLEUR
(A Limited Liability Company)

BY: _____

WARD LAFLEUR - I.D. NO. 01770
KAY A. THEUNISSEN - ID. NO. 17448
MARC D. MOROUX - ID. NO. 19071
P. O. Box 3089
Lafayette, LA 70502
Telephone: (337) 266-2189

**COUNSEL FOR AKER MARINE
CONTRACTORS, INC.**

LARZELERE, PICOU & WELLS, L.L.C.

BY: _____

J. DANIEL PICOU, T.A. (#13827)
W. O. LARZELERE, JR. (#8057)
JOHN S. GARNER (#25314)
MARY KERRIGAN DENNARD (#18285)
Two Lakeway Center - Suite 1100
3850 N. Causeway Boulevard
Metairie, Louisiana 70002
Telephone:  504-834-6500
Facsimile:  504-834-6565

**COUNSEL FOR TRANSOCEAN OFFSHORE (U.K.) INC., as Owner, and TRANSOCEAN OFFSHORE VENTURES INC., TRANSOCEAN OFFSHORE U.S.A. INC. and TRANSOCEAN DEEPWATER DRILLING INC., as Operators/Managers of TRANSOCEAN 96**

ADAMS AND REESE, L.L.P.

BY: _____

JAMES T. ROGERS, III  (#21845)
FRANK V. LIANTONIO, JR.  (#19282)
CHARLES A. CERISE, JR. (#1755)
4500 One Shell Square
New Orleans, LA 70139
Telephone:  581-3234
Facsimile:  566-0210

**COUNSEL FOR JOHN E. CHANCE &
ASSOCIATES, INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 13th day of August, 2002, served a copy of the foregoing

on all counsel of record via the United States Postal Service, properly addressed and postage prepaid.

EVANS MARTIN MCLEOD

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **POSEIDON OIL PIPELINE COMPANY, L.L.C., ET AL.** | **CIVIL ACTION** |
| | **NO. 00-760 C/W 00-2154** |
| **VERSUS** | |
| | **SECTION "T"** |
| **TRANSOCEAN SEDCO FOREX, INC., ET AL.** | **MAGISTRATE 2** |

### MEMORANDUM IN SUPPORT OF
### JOINT MOTION TO EXCLUDE MARATHON OIL COMPANY'S
### PROFFERED "RESERVOIR DAMAGE" EXPERT
### TESTIMONY OF WAYMAN L. GORE, JR.

**MAY IT PLEASE THE COURT:**

Edison Chouest Offshore, L.L.C., Galliano Marine Service, L.L.C., Aker Marine Contractors, Inc., John E. Chance & Associates, Inc., Transocean Offshore (U.K.), Inc., Transocean Offshore Ventures, Inc., Transocean Offshore U.S.A, Inc., and Transocean Deepwater Drilling, Inc. (collectively, the "Movants") respectfully submit that this Honorable Court should exclude Marathon Oil Company's proffered expert testimony of Wayman T. Gore, Jr., according to Federal Rule of Evidence 702 because his methodology and conclusions, among other things, rely on suspect evidence, are untested, are not reviewed, are not published, and do not rule out alternate causes, and,

so, are unreliable. As a result, Mr. Gore's proffered testimony concerning the *existence or causation* of any *physical damage* to Marathon's leased mineral interests in the Ewing Bank Block 873 should be excluded from evidence at trial.[1]

## I.   INTRODUCTION

The Federal Rules of Civil Procedure allow expert testimony only if that testimony is the product of reliable principles and methods based upon sufficient facts or data that are applied reliably to the facts of the case. Here, Marathon proffers the expert testimony of petroleum engineer, Mr. Gore, who posits – based only upon a short term oil production trend and a theory about water encroachment – that Movants *caused* Marathon *damage* when its platform was shut in following the Poseidon pipeline rupture. But (1) Marathon's own computer simulation models, which are based upon actual facts and data, show no measurable decrease in oil production after the shut in; (2) Marathon's corporate witness Mr. David R. Petro testified that a short term oil production trend is an unreliable methodology to assess whether oil reserves have been "bypassed;" and (3) to this day, Marathon has not reduced their booked oil reserves due to the shut in. So, the question before this Honorable Court is simply this: is it proper for that expert theory to be admitted at trial when it stands against Marathon's own facts, data, computer simulation models, and sworn testimony? No, the Movants submit, and they respectfully ask this Honorable Court to exclude such testimony.

---

[1] With this *Daubert* motion, the Movants have also requested summary judgment against Marathon under the principle established by *Robins Dry Dock* and its progeny as respects the claim associated with losses arising out of its leased mineral interests in Ewing Bank 873 Block, both as a matter of law and because Marathon's only proffered evidence of the *existence or causation* of any *damage* to its leased mineral interests in the Ewing Bank 873 Block is that submitted by Mr. Gore.

## II.   BACKGROUND

This Honorable Court is well-aware of this case's background.  The Movants will discuss only those facts germane to its motion.

### A.   Facts

Marathon, jointly with Texaco Exploration and Production, Inc. ("Texaco"), own a fixed oil and gas platform named Ewing Bank 873 (the "Platform"), which produces oil and gas from  what is known as the Lobster Field.  Ewing Bank 873 is located 130 miles southwest of New Orleans, Louisiana, in 800 feet of water.  A total of twenty-four (24) wells have been drilled in  Ewing Bank Block 873.  These wells produce/produced oil that flow/flowed through the Platform.

The Platform's oil production  is transported to Houma, Louisiana, via a 24-inch Poseidon Oil Pipeline Company line.  On January 21, 2000, an anchor from a Transocean drilling rig ruptured this 24-inch line, and the Poseidon pipeline system was shut in.  As a result, the Platform and the wells were also shut in from January 22, 2000, until February 13, 2000, i.e., 23 days.

### B.   Marathon's "Lost" Oil Claim

In an attempt to circumvent *Robins Dry Dock* and recover alleged lost profit damages from the shut in event, even though it admits that the Platform and the wells themselves sustained no physical damage,[2] Marathon and Texaco "weigh in" with a red herring:  they claim that they sustained physical damage in that they "lost" the ability to produce from their Platform and wells certain oil and gas from the Ewing Bank Block 873.  Being unable to point to concrete facts and data from its complicated computer reservoir simulation models to prove this, Marathon did the next best

---

[2]  *See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed.2d 290 (1927).

thing: it hired an expert  – Mr. Gore – to say so.[3]  But Mr. Gore's methodology and opinions on the *existence or causation* of any *physical damage* to Marathon's leased mineral interests in the Ewing Bank Block 873 are not the product of reliable principles, are not based upon sufficient facts or data but instead only suspect evidence, are not applied reliably to this case's facts, and do not attempt to exclude alternate causes for Marathon's claimed damage.

C.       **Mr. Gore's Report**[4]

In short, Marathon claims that following the pipeline rupture, it sustained *physical damage* because it "lost" its ability to produce certain oil and gas from the Platform and wells in the Ewing Bank Block 873.  Mr. Gore opines that this occurred when water encroached on the reservoirs where the wells were producing, pushing recoverable oil past the wells.   Specifically, Gore opines Marathon sustained physical damage to the Platform/wells/its lease mineral interests in the Ewing Bank Block 873 in that:

1.       "[E]xtended shut-ins, late in the life of the reservoir, [are] very harmful."[5]

2.       Generally, following the shut in of a well, a well either

    "return[s] to production after the shut-in at a rate greater than the rate at which it was producing prior to the shut-in" and then "declines down to [the] previous production rate;" or

---

[3]  In actuality, the purpose of Mr. Gore's proffered expert testimony is two-fold.  First, it is a thinly veiled attempt to circumvent the general maritime law principle that a platform owner who suffers only economic loss following a casualty has no claim against the tortfeasor.  *E.g.*, *Robins Dry Dock*, *supra*.   Second, had its Platform sustained physical damage (which it did not), Mr. Gore's proffered testimony is also a thinly veiled attempt to circumvent the general maritime law rule that a damaged platform owner can recover only the economic loss sustained as a result of its deferred production, and not lost profits.  *E.g., Nerco Oil & Gas, Inc.*, 74 F.3d 667 (5th Cir. 1996).

[4]  Mr. Gore is scheduled to be deposed on August 13, 2002, and, as such, as this motion is being filed, his deposition testimony is unavailable.   The Movants will supplement their memorandum as necessary with Mr. Gore's deposition testimony.

[5]  *See* attached as Exhibit "A," Mr. Gore's June 13, 2002, report, at p. 10.

"returns to production after the shut-in at the rate at which it was producing prior to the shut-in" and then "produces at a decline rate that is less than the previously established trend."[6]

Following shut in of the Platform/wells, however, the Platform/wells did not produce according to this hypothesis.

3.     "[D]uring a shut-in water encroachment pushes oil past wells into structure positions rendering it unrecoverable."[7]

4.     The average oil production from the Platform for the 23 days before the shut in was greater than the average of oil production for the 14 days after the shut in, which indicates "reservoir damage and a loss in ultimate [oil] recovery."[8]

5.     "The geologic formation of the Lobe 10 sand, the location of the producing wells within the reservoir and the individual well performance, in my opinion, explains how a loss of recoverable oil occurred as a result of the Poseidon shut-in."[9]

6.     "[T]he ultimate recovery from Marathon Oil Company's Ewing Bank 873 platform has been reduced, in my opinion, as a result of the Poseidon pipeline rupture and subsequent shut-in."[10]

As highlighted below, however, this Honorable Court should exclude Mr. Gore's opinions concerning any physical damage because his opinions and his methodology are unreliable and unsupported by any scientific evidence and instead based only upon suspect evidence.

**D.     Mr. Gore's Opinions Lack Sufficient Facts/Data/Analysis**

Mr. Gore's methodology and opinions that the Ewing Bank Block 873 sustained any *physical damage* by water encroachment are fatally flawed because he does not provide much

---

[6]  Exhibit "A," Mr. Gore's report at pp. 3-4.

[7]  Exhibit "A," Mr. Gore's report at p. 10.

[8]  Exhibit "A," Mr. Gore's report at pp. 3-4.

[9]  Exhibit "A," Mr. Gore's report at p. 7.

[10]  Exhibit "A," Mr. Gore's report at p. 10.

information that would be commonly relied upon by other experts in the field to form his opinions,

including:

    1.      An engineering calculation of the volume of water encroachment, if any, during the shut in period.[11]

    2.      An engineering calculation of the actual aquifer size and aquifer pressure profile.[12]

    3.      An engineering calculation of the effect of water encroachment on each well individually in the system.[13]

    4.      Once production from the system was reestablished, there must be an analysis of the effect of the producing wells on displaced oil (to determine if that oil is recoverable).[14]

    5.      Assuming the system was damaged, Mr. Gore makes no reliable analysis of how said damage, i.e., the volume of oil and gas allegedly lost, relates to the total platform production volume for the shut in time frame.[15]

    6.      An explanation of why Marathon and Texaco never revised their booked oil and gas reserve estimates downward following the shut-in although Mr. Gore claims that Marathon lost more than one million barrels of oil.[16]

    7.      An explanation of why it is reliable, as he did, to extrapolate only from certain areas of the system that were allegedly affected to conclude that the entire production volume of the shut-in was decreased.[17]

---

[11] *See* attached as Exhibit "B," the Declaration of petroleum engineer Mr. Calvin C. Barnhill, which attaches his July 13, 2002, expert report, at p. 16, which was submitted by Edison Chouest, Galliano Marine Service, Aker Marine Contractors, and John. E. Chance & Associates.

[12] Exhibit "B," Barnhill declaration, expert report at pp. 16, 23.

[13] Exhibit "B," Barnhill declaration, expert report at p. 23.

[14] Exhibit "B," Barnhill declaration, expert report at p. 23.

[15] Exhibit "B," Barnhill declaration, expert report at p. 22.

[16] See attached as Exhibit "C," the deposition of David R. Petro, at pp. 268-69.  Exhibit "B," Barnhill declaration, expert report at p.22.

[17] *See* attached Exhibit "D," the Declaration of petroleum engineer Mr. Adam T. Bourgoyne, Jr., which attaches his July 15, 2002, expert report, at p. 8, which was submitted by Transocean.

8.      Why the "displaced" oil could not be recovered as a result of the continuing pressure decline in the system.[18]

9.      In the past, Marathon has performed reservoir simulation models to assess the effect of previous shut ins on the Platform's production, but did not do so in this case? If such a model was done, why did Mr. Gore not compare/rely on the model, as was Marathon's procedure and which is formed on actual facts and data, as opposed to simply just forming his subjective opinion.[19]

11.     An explanation of why one well's – A21 – producing ratio of water to oil initially decreased after the shut in, which should have been the opposite had water encroachment occurred.[20]

12.     An explanation of how discontinuing water injection in certain wells – A21 and A15 – affected the Platform's production following the shut in.[21]

13.     Assuming the Platform's production dropped, an explanation of why it might not just take Marathon longer to capture the "displaced" oil, resulting only in deferred production.[22]

14.     A calculation of the effect on oil and gas production of the unrelated overboard water discharge problem that caused several wells to be either shut in or curtailed.[23]

15.     An explanation of the factors that dictate the economic limits for the production of reserves from the Platform.[24]

---

[18]  Exhibit "B," Barnhill declaration, expert report at p. 21.

[19]  Exhibit "C," Petro deposition, at pp. 268-69.  Exhibit "B," Barnhill declaration, expert report at pp. 17-18.

[20]  Exhibit "B," Barnhill declaration, expert report at p. 19.

[21]  Exhibit "B," Barnhill declaration, expert report at p. 19.

[22]  Exhibit "D," Bourgoyne declaration, expert report at p. 5.

[23]  Exhibit "B," Barnhill declaration, expert report at pp. 14-15.

[24]  Exhibit "B," Barnhill declaration, expert report at p. 17.

16.     An explanation of why there was no significant increase in pressure in any of the Platform's wells during or after the shut in period, which is expected if water encroachment occurred.[25]

**E.     Mr. Gore's Methodology and Opinions are Unreliable**

Not only is none of the key information outlined above provided in Mr. Gore's report, but Mr. Gore's methodology and opinions that the Ewing Bank Block 873 sustained any physical damage are also unreliable in light of the following:

1.     Mr. Gore fails to make an "apples to apples" comparison of the Platform's production before and after the shut in.  Were the same wells set up and producing the same way into the identical production system before and after the shut in?  No.  And Mr. Gore did not consider the effects of this.[26]

2.     Marathon's own reservoir computer simulations computed reservoir performance with and without the 23-day shut and did not show any significant, i.e., outside the simulation's truncation error rate, decrease in predicted oil recovery.[27]

3.     Even though the Platform's production was in a down trend before the shut in, Mr. Gore assumes that its average daily production measured over a 2-week period after the shut in will be the same or higher than the average daily production over the 2-week period before the shut in.   What studies, publications, treatises, or articles does he rely on other than his own subjective opinion? None.

4.     He does not point to any basis in the established and extensive published studies and literature on the factors that influence offshore oil and gas production  for any of his opinions or sub-theories.

5.     He relies upon short term rather than long term Platform production trends to support his methodology/opinions.  It is not reasonable and reliable to evaluate and compare  the effect of the Platform's shut-in over only a pre shut in period of 23 days and a post shut in period of 14 days,  as opposed to a longer time frame, such as six (6) months, which Marathon's reservoir

---

[25]  Exhibit "D," Bourgoyne declaration, expert report at p. 28.

[26]  Exhibit "B," Barnhill declaration, expert report at p. 14.

[27]  Exhibit "D," Bourgoyne declaration, expert report at p. 5.

engineer and corporate witness Mr. David R. Petro testified was necessary before Marathon would consider changing its booked oil reserves.[28]

6.      He fails to account for the correction factor that applies to production well test data, including unrelated shut ins, that could account for any discrepancies in production.[29]

7.      He did not perform a statistical error analysis to determine the likely accuracy or confidence level of his calculation method in view of the observed production rate variations.[30]

8.      His methodology to calculate the amount of uncaptured oil is unrelated to his theory of water encroachment causing oil bypass of the Platform's wells.[31]

9.      He cites no texts or treatises or reliance on the body of published studies concerning water encroachment to support his methodology and opinions.

Mr. Gore's methodology and opinions that Ewing Bank Block 873 sustained any physical damage are not based on sufficient scientific facts and data, stand against Marathon's own corporate testimony of Mr. David R. Petro that short term production trends are unreliable, and, do not sufficiently address much if any of the relevant information to explain why the Platform's production – if it did at all – decreased after the shut in. The Movants respectfully ask this Honorable Court to exclude Mr. Gore's testimony on these issues.

---

[28] *See* attached as Exhibit "C," an excerpt of Mr. David R. Petro's deposition, at pp. 238-39, 247-48.

[29] Exhibit "D," Bourgoyne declaration, expert report at pp. 25-26.

[30] Exhibit "D," Bourgoyne declaration, expert report at p. 5.

[31] Exhibit "D," Bourgoyne declaration, expert report at p. 6.

## II.   LAW AND ARGUMENT

### A.   <u>Standards for Expert Testimony</u>

Federal Rule of Evidence 702 and the decisions of the United States Supreme Court in

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[32] and *Kumho Tire Co. v. Carmichael,*[33] provide the

basis to admit "expert" testimony.   Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training or education,
> may testify thereto, in the form of an opinion or otherwise, if (1) the
> testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Rule 702 charges this Honorable Court with the responsibility to act as gatekeeper as to all expert

testimony – including opinions on engineering – and not just testimony based on science.[34]   A

district court should refuse to allow an expert witness to testify if it finds that the witness is not

qualified to testify in a particular field or on a *given subject.*[35]

As the proponent of the proffered testimony, Marathon bears the burden to prove that Gore's

testimony should be admitted.   Recognizing that expert testimony can be both powerful and

misleading, the *Daubert* Court heightened the standard of admissibility against which expert

testimony is assessed and charged the courts with a more active role as "gatekeeper" against the tide

of suspect evidence.[36]   The district court must ensure that an expert's testimony "comports with

---

[32]   509 U.S. 579 (1993).

[33]   526 U.S. 137, 119 S.Ct. 1167 (1999); *see also Black v. Food Lion, Inc.,* 171 F.3d 308, 310 (5th Cir. 1999).

[34]   *Kumho,* 526 at 148, 119 S.Ct. at 1178.

[35]   *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999).

[36]   *Daubert,* 509 at at 579.

applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience of [the] discipline.'"[37]  This task requires that the Court evaluate the methods, analysis and principles relied upon by the expert in reaching his/her opinion.[38]   To determine if it should admit expert testimony, the district court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[39]  It is *relevant* when it relates to any issue in the case; *reliable,* when "grounded in the methods and procedures of science and . . . more than unsupported speculation or subjective belief.'"[40]

The focus is on the expert's methodology, not on his generated opinions,[41] and the Court must determine whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue.[42]  An expert's opinion must be grounded in the methods and procedures of science of the applicable profession and must consist of more than "subjective belief or unsupported speculation."[43] Regardless of the expert's subject matter, the *Daubert* examination is "germane to evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same

---

[37]  *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997)(*citing Daubert*, 509 U.S. at 592).

[38]  *Watkins*, 121 F.3d at 991.

[39]  *Daubert*, 509 U.S. at 589.

[40]  *Id.* at 591; *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir.1999).

[41]  *Daubert*, 509 U.S. at 594-95.

[42]  *Id.* at 592-93.

[43]  *Id.* at 590.

scrutiny that it would among his professional peers."[44]   A necessary ingredient of an expert's methodology and opinions is the exclusion of alternative causes.[45] The district court may exclude expert testimony when the expert offers little more than his credentials and a subjective opinion.[46] If there is "too great of an analytical gap between the data and the opinion proffered, the testimony should be excluded."[47] Despite this, however, a district court enjoys wide latitude to determine when to admit expert testimony, and its discretion will not be disturbed on appeal unless manifestly erroneous.[48]  A district court abuses its discretion if it admits expert testimony that is *not* relevant and reliable.[49]

Applying these standards to this case, the Movants submit that Mr. Gore's testimony should not be admitted because he offers nothing more to this Honorable Court than credentials and a subjective opinion.  There is no scientific evidence to support his methodology and opinions that Ewing Bank Block 873 sustained any physical damage.

1. *Gore's methodology and opinions are unreliable.*

To be admitted, Mr. Gore's testimony must be the product of reliable principles and methods that are applied reliably to the facts of this case.  They are neither.  Specifically, the reliability of

---

[44] *Watkins,* 121 F.3d at 991 (upholding district court decision to exclude "expert" conclusion made without any scientific or technical basis).

[45] *See Michaels v. Avitech, Inc.,* 202 F.3d 746 (5th Cir. 2000)(*citing In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 757, 759 n. 27 (3rd Cir.1994)).

[46] *See Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 421 (5th Cir.1987).

[47] *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[48] *Id.* at 988.

[49] *Kumho*, 526 U.S. at 145.

Gore's testimony is evaluated in light of a non-exhaustive checklist that the Supreme Court identified in *Daubert*.[50]   These are:

1.  Whether the expert's technique or theory can or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for liability;

2.  Whether the technique or theory has been subject to peer view and publication;

3.  The known or potential rate of error with a technique or theory when applied;

4.  The existence of maintenance and standards of control;

5.  Whether the technique or theory has been generally accepted in the scientific community.

In this case, Gore's proffered testimony satisfies none of these factors.  First, Mr. Gore's methodology and opinions have not, and indeed, cannot be tested, because although he avers that water encroachment occurred, he did not assess the size of the aquifer system, the pressure of the aquifer system, the volume of water encroachment,  the effects of the overboard water problem, or discontinuance of water injection on the wells  – among other facts – that are necessary to test his theory.  In addition, Marathon performed a computer reservoir model that compared pre shut in and post shut in production trends, which shows the difference in the two trends to be within the normal error rate of the model.[51]  Nor are his opinions based on an "apples to apples" comparison of the platform's production before and after the shut in.  This indicates that Mr. Gore is nothing more than a "hired gun" whose methodology and opinions are subjective, are based on selective facts and data,

---

[50]  509 U.S. 594-95. The *Daubert* factors need not be rigidly applied in every case.   *See Kumho,* 119 S.Ct. at 1171; *see also Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir.1999).

[51] Exhibit "D," Bourgoyne declaration, expert report at p. 5. Mr. Petro testified for Marathon that a computer reservoir simulation model is the appropriate way to assess the effects of a shut in. Exhibit "C," Mr. Petro deposition, at pp. 238-39, 247-48.

13

and would not withstand his peer's scrutiny.[52]  As the Supreme Court noted in *General Electric Co. v. Joiner*, "nothing in either *Daubert* or the Federal Rules of Evidence requires the district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."[53]

For these reasons, this factor weighs heavily against admissibility.

Second, Mr. Gore cites no facts or evidence that his theory has been subject to peer view or publication.[54]  Mr. Gore identifies no facts to support that his opinions are generally accepted in the petroleum, geological, or hydrogeological communities.[55] This factor also weighs against admissibility. Third, the known or potential rate of error of Gore's opinions is *unknown*.  He could have, but did not, perform a statistical error analysis to determine the likely accuracy or confidence level of his calculation method in view of the observed production rate variations.[56] Also, since his methodology applies short term production trends rather than long term production trends, when Marathon's own corporate witness Mr. David Petro states the latter is appropriate, common sense suggests that the potential rate of error is great because misleading transient effects on production are eliminated over the longer term.   Specifically, Marathon's corporate witness  Mr. Petro, who testified more than two years after the pipeline rupture and in response to the question of whether Marathon had reduced its booked oil reserves as a result of the shut in, himself calls into question Mr. Gore's methodology and opinions:

---

[52]  *Watkins,* 121 F.3d at 991

[53]  522 U.S. at 146.

[54]  Exhibit "A," Mr. Gore's report.

[55]  Exhibit "A," Mr. Gore report.

[56]  Exhibit "D," Bourgoyne declaration, p. 5.

Q.    Have there been any adjustments to the ARRs based on any lost production that Marathon is claiming as a result of this pipeline rupture?

A.    In reference to the pipeline rupture at this point, **we have not made an adjustment to the reserve system**.  And that really is process that we take very -- the process of making those adjustments is taken very seriously, and what we want to do is over a **longer period of time** evaluate that loss, and then make the necessary adjustments to our reserve system.

What we don't want to do, taking short term adjustments plus, adjustments minus, plus, minus, we do not work in that mode. **We don't make knee jerk reactions to our reserve changes based on some short window of perceived change.**

**We want to make sure it's a substantiated -- we want to make sure it's substantiated with an updated simulation model**, and that would be done up in the course of the next year, two years, and it would continue to be monitored.

So from a reserve add or subtract, we are very cautious at including reserves on and off.  We don't want to get into a plus, minus mode every year because a well didn't produce, or a well produced, or something along those lines.[57]

This internal contradiction between Mr. Gore's "knee jerk" methodology/opinions based upon his "perceived change" and Marathon's own procedures – that is, short term verus long term production trends and reserve estimates based on computer simulation models versus theory – weighs against admissibility.

Fourth, Mr. Gore does not refer to the existence and/or maintenance of any standards that governed his methodology and/or that would help substantiate his proffered expert testimony.[58] Finally, there is no evidence that Mr. Gore's methodology and opinions have any support in his field

---

[57] Exhibit "C," the deposition of David R. Petro, at pp. 268-69 (emphasis added).

[58] Exhibit "A," Gore's June 13, 2002, report.

or in the field of hydrogeology.[59]  Indeed, the only evidence is directly to the contrary and is offered

by Gore's client, Marathon. As stated and outlined above, Marathon's corporate witness, Mr. Petro,

testified that at least 6 months is needed to evaluate production trends and that Marathon's procedure

was to use computer simulation models to evaluate production trends following prior shut ins and

to evaluate oil reserves.[60]  Given these contradictions, is it appropriate that Mr. Gore's opinions be

admitted at trial?  Of course not.

     2.    *Mr. Gore fails to rule out any alternative causes and fails to bridge the analytical*
         *gap for the decreased production he  identifies from his short term trend analysis.*

     In addition to the *Daubert* factors, courts assess the expert opinion's reliability by

determining if the expert ruled out any alternative causes in his/her opinions and if the expert's

opinion bridges the "analytical gap" between the facts/data and the proffered opinion.[61]  Failure to

rule out any alternative causes renders the opinion unreliable.[62]  Mr. Gore did not rule out any

potential alternative causes for his short term decreased production theory.  Among other issues, he

did not  consider (i) why one well's – A21 – producing ratio of water to oil  initially decreased after

the shut in, which should have been the opposite had water encroachment occurred;[63] (ii) how

discontinuing water injection in certain wells – A21 and A15 – affected the Platform's production;[64]

(iii) why, assuming the Platform's production dropped after the shut in, it might not just take

---

[59]  Hydrogeology includes, among other things, the study of where underground water is located, how water interacts with geological systems, and how water moves underground.

[60]  Exhibit "C," an excerpt of Mr. Dave Petro's deposition, at pp. 238-39, pp. 247-48.

[61]  *Michaels*, 202 F.3d at 746;  *General Elec. Co.*, 522 U.S. at 146.

[62]  *Id.*

[63]  Exhibit "B," Barnhill declaration, expert report at p. 19.

[64]  Exhibit "B," Barnhill declaration, expert report at p. 19.

Marathon longer to capture the "displaced" oil, resulting only in deferred production; (iv) the effect on oil and gas production of the unrelated overboard water discharge problem that caused several wells to be either shut in or curtailed;[65] (v) how other factors dictate the economic limits for the production of reserves from the Ewing Bank 873 Block;[66] or (vi) why there was no significant increase in pressure in any of the Platform's wells during or after the shut in period, which is expected if water encroachment occurred.[67]

Similarly, the limited facts upon which Mr. Gore chooses to form his opinion do not bridge the "analytical gap" between the two such that his opinions could be reliable.[68] Although he opines that Marathon allegedly lost more than one million barrels of oil following the shut in, he does not detail how that relates to his water encroachment theory. For example, he could have, but did not, calculate the size of the aquifer system, the volume of alleged water encroachment on each well during the shut in, the aquifer system's pressure profile, and, based on these calculations, the amount of oil allegedly "bypassed" on a well by well basis.[69] Each of these calculations are what experts in the field would rely on to draw any conclusions concerning water encroachment. Further, he references only certain of the Platform's wells and extrapolates their production to that of the total Platform production.[70] In sum, the "analytical gap" between Mr. Gore's water encroachment theory

---

[65] Exhibit "B," Barnhill declaration, expert report at pp. 14-15.

[66] Exhibit "B," Barnhill declaration, expert report at p. 17.

[67] Exhibit "D," Bourgoyne declaration, expert report at p. 28.

[68] *General Elec. Co.*, 522 U.S. at 146.

[69] Exhibit "B," Barnhill declaration, expert report at pp. 16, 23.

[70] Exhibit "D," Bourgoyne declaration, expert report, at p. 8

and the volume of oil that he calculates was "bypassed" is too great for his testimony to be relied upon by this Honorable Court.[71]

In short, Mr. Gore's opinion that Ewing Bank Block 873 sustained any physical damage lacks any scientific basis. His methodology and opinions leave out a wealth of necessary information, and he failed fully to investigate/assess/analyze the issues involved. He failed to rule out any other causes of the alleged decreased production. Despite the vast amount of oil formation literature, hydrogeological and related studies, and information available on the various factors that may cause physical damage to an oil formation, that may affect oil production and water encroachment, he does not fully explain or identify a scientific basis for the phenomena he alleges – *physical damage* to Ewing Bank Block 873. Mr. Gore's opinions ought to be excluded from this case's trial.

## IV.    CONCLUSION

Mr. Gore's "knee jerk" methodology and opinions based upon his "perceived change" in Platform oil production contradict Marathon's own procedures. They are unsupported by any publications and are not accepted in the relevant petroleum, geological, and hydrogeological communities. His methodology and opinions fail rule out any alternative causes for the phenomena he alleges and do not bridge the "analytical gap" that he makes. The evidence lacks any scientific basis for him to conclude that Ewing Bank Block 873 sustained any *physical damage* because of the shut in. For these reasons, the Movants respectfully submit that Mr. Gore's testimony should be excluded from this case's trial.

---

[71] *General Elec. Co.*, 522 U.S. at 146.

Respectfully submitted,

PHELPS DUNBAR LLP

By: _____
Robert P. McCleskey, Jr., T.A. (Bar No. 09151)
William J. Riviere (Bar No. 20593)
Thomas Kent Morrison (Bar No. 25802)
Evans Martin McLeod (Bar No. 24846)
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana  70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130 or 9007

**COUNSEL   FOR   EDISON   CHOUEST
OFFSHORE, L.L.C. AND GALLIANO MARINE
SERVICE, LLC**

MAHTOOK & LAFLEUR
(A Limited Liability Company)


BY: _____

WARD LAFLEUR - I.D. NO. 01770
KAY A. THEUNISSEN - ID. NO. 17448
MARC D. MOROUX - ID. NO. 19071
P. O. Box 3089
Lafayette, LA 70502
Telephone: (337) 266-2189

**COUNSEL FOR AKER MARINE
CONTRACTORS, INC.**

LARZELERE, PICOU & WELLS, L.L.C.

BY:     _____

J. DANIEL PICOU, T.A. (#13827)
W. J. LARZELERE, JR. (#8057)
JOHN S. GARNER (#25314)
MARY KERRIGAN DENNARD (#18285)
Two Lakeway Center - Suite 1100
3850 N. Causeway Boulevard
Metairie, Louisiana 70002
Telephone:  504-834-6500
Facsimile:  504-834-6565

**COUNSEL FOR TRANSOCEAN
OFFSHORE  (U.K.) INC., as Owner, and
TRANSOCEAN OFFSHORE VENTURES
INC., TRANSOCEAN OFFSHORE U.S.A.
INC. and TRANSOCEAN DEEPWATER
DRILLING INC., as Operators/Managers
of TRANSOCEAN 96**

ADAMS AND REESE, L.L.P.

BY: _____

JAMES T. ROGERS, III  (#21845)
FRANK V. LIANTONIO, JR.  (#19282)
CHARLES A. CERISE, JR. (#1755)
4500 One Shell Square
New Orleans, LA 70139
Telephone: 581-3234
Facsimile: 566-0210

**COUNSEL FOR JOHN E. CHANCE &
ASSOCIATES, INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 13th day of August, 2002, served a copy of the foregoing

on all counsel of record via the United States Postal Service, properly addressed and postage prepaid.

EVANS MARTIN MCLEOD

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **POSEIDON OIL PIPELINE COMPANY, L.L.C., ET AL.** | **CIVIL ACTION** |
| | **NO. 00-760 C/W 00-2154** |
| **VERSUS** | |
| | **SECTION "T"** |
| **TRANSOCEAN SEDCO FOREX, INC., ET AL.** | **MAGISTRATE 2** |

## ORDER

The Court has considered the joint motion of Edison Chouest Offshore, L.L.C., Galliano Marine Service, L.L.C., Aker Marine Contractors, Inc., John E. Chance & Associates, Inc., Transocean Offshore (U.K.), Inc., Transocean Offshore Ventures, Inc., Transocean Offshore U.S.A., Inc., and Transocean Deepwater Drilling, Inc. to exclude Marathon Oil Company's proffered "reservoir damage" expert testimony of Wayman L. Gore, Jr. Having considered the motion and the evidence and arguments adduced hereof, the Court grants the motion.

NO:99297724.1

Accordingly, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Marathon Oil Company's proffered expert testimony of Wayman T. Gore, Jr., concerning the existence and/or causation of any damage to its lease mineral interests in the Ewing Bank 873 Block is hereby excluded from trial of this case.

_____

THE HONORABLE G. THOMAS PORTEOUS, JR.

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**POSEIDON OIL PIPELINE COMPANY, L.L.C., ET AL.**

**CIVIL ACTION**

**NO. 00-760 C/W 00-2154**

**VERSUS**

**SECTION "T"**

**TRANSOCEAN SEDCO FOREX, INC., ET AL.**

**MAGISTRATE 2**

## NOTICE OF HEARING

PLEASE TAKE NOTICE that the Joint Motion to Exclude Marathon Oil Company's Proffered "Reservoir Damage" Expert Testimony of Wayman L. Gore, Jr., filed on behalf of Edison Chouest Offshore, L.L.C. and Galliano Marine Service, L.L.C., will be brought on for hearing before the Honorable G. Thomas Porteous, Jr., 500 Camp Street, New Orleans, Louisiana, on the Court's regular motion docket on Wednesday, August 28, 2002, at 10:00 a.m.

NO:99297720.1

Respectfully submitted,

PHELPS DUNBAR LLP

By: _____

Robert P. McCleskey, Jr., T.A. (Bar No. 09151)
William J. Riviere (Bar No. 20593)
Thomas Kent Morrison (Bar No. 25802)
Evans Martin McLeod (Bar No. 24846)
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana  70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130 or 9007

**COUNSEL   FOR   EDISON   CHOUEST OFFSHORE, L.L.C. AND GALLIANO MARINE SERVICE, LLC**

MAHTOOK & LAFLEUR
(A Limited Liability Company)


BY: _____

WARD LAFLEUR - I.D. NO. 01770
KAY A. THEUNISSEN - ID. NO. 17448
MARC D. MOROUX - ID. NO. 19071
P. O. Box 3089
Lafayette, LA 70502
Telephone: (337) 266-2189

**COUNSEL FOR AKER MARINE
CONTRACTORS, INC.**

LARZELERE, PICOU & WELLS, L.L.C.

BY: _____

J. DANIEL PICOU, T.A. (#13827)
W. J. LARZELERE, JR. (#8057)
JOHN S. GARNER (#25314)
MARY KERRIGAN DENNARD (#18285)
Two Lakeway Center - Suite 1100
3850 N. Causeway Boulevard
Metairie, Louisiana 70002
Telephone:  504-834-6500
Facsimile:  504-834-6565

**COUNSEL FOR TRANSOCEAN
OFFSHORE (U.K.) INC., as Owner, and
TRANSOCEAN OFFSHORE VENTURES
INC., TRANSOCEAN OFFSHORE U.S.A.
INC. and TRANSOCEAN DEEPWATER
DRILLING INC., as Operators/Managers
of TRANSOCEAN 96**

ADAMS AND REESE, L.L.P.

BY: _____

JAMES T. ROGERS, III  (#21845)
FRANK V. LIANTONIO, JR.  (#19282)
CHARLES A. CERISE, JR. (#1755)
4500 One Shell Square
New Orleans, LA 70139
Telephone:  581-3234
Facsimile:  566-0210

**COUNSEL FOR JOHN E. CHANCE &
ASSOCIATES, INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this 13th day of August, 2002, served a copy of the foregoing

on all counsel of record via the United States Postal Service, properly addressed and postage prepaid.

_____
EVANS MARTIN MCLEOD

**SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED**