FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 OCT 30  PM 4: 52

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE | * | CIVIL ACTION |
| COMPLAINT OF TRANSOCEAN | * | |
| OFFSHORE (U.K.) INC., As Owner, | * | NO.  00-0760 c/w 00-2154 |
| and TRANSOCEAN OFFSHORE | * | |
| VENTURES INC., TRANSOCEAN | * | SECTION: "T" |
| OFFSHORE U.S.A. INC., and | * | |
| TRANSOCEAN DEEPWATER | * | MAGISTRATE: "2" |
| DRILLING INC., As | * | |
| Operators/Managers of | * | JUDGE PORTEOUS |
| TRANSOCEAN 96, For Exoneration | * | |
| From or Limitation of Liability. | * | MAGISTRATE JUDGE |
| | * | WILKINSON |
| | * | |
| | * | |
| | * | |

## Memorandum on Behalf of Marathon Oil Company and
## Texaco Exploration and Production Inc. in Opposition to Defendants' Motion to
## Exclude Testimony of Reservoir Engineer, Wayman T. Gore, Jr.

**MAY IT PLEASE THE COURT:**

In this case, as discussed in more detail below, the defendants jointly caused an eight ton

anchor to rupture the Poseidon oil pipeline, and the resulting shut-in of the wells at Ewing Bank

Block 873 caused reservoir damage and lost production to Marathon Oil Company ("Marathon")

Fee
Process
Dktd
CtRmDep
Doc. No.

and Texaco Exploration and Production Inc. ("Texaco") (hereafter collectively referred to as "Claimants"). The defendants are now scrambling to prevent Claimants from recovering their damages by attempting to rely on the decision in *Robins Dry Dock & Repair Co. v. Flint*, 48 S.Ct. 134 (1972). Separate oppositions have been filed to the defendants' *Robins Dry Dock* motions (which are without merit for the reasons set forth therein), but the defendants needed to muster support for those motions so they have moved, ostensibly under the standards adopted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), to exclude the testimony of Claimants' expert petroleum engineer, Wayman Gore. In fact, however, it is Mr. Gore's opinions that the defendants do not like, not his methodology, and Claimants submit that Mr. Gore's testimony, qualifications, methodology, and analysis fully comport with the *Daubert* criteria. In addition, rather than applying a *Daubert* analysis, the defendants simply regurgitate their own experts' reports. The defendants' motion should therefore be denied in all respects.

## I.    Background

### a.    The Accident.

On January 21, 2000, the mobile drilling rig Transocean 96 attempted a transit in the Gulf of Mexico between Ship Shoal Block 361 and Grand Isle Block 116, approximately 100 miles South of Louisiana. Aker Marine Contractors, Inc. ("Aker"), Edison Chouest Offshore, LLC, and Galliano Marine Service, LLC ("Chouest"), and John E. Chance & Associates, Inc.

("Chance"), had been hired to work with Transocean[1] to recover the rig's ten anchors prior to the move. They recovered all of the anchors but one. They left the E2 anchor on the bottom, and as the rig made its transit, it dragged the anchor across the seafloor for over twenty miles, striking at least four different pipelines before it snagged and ruptured the Poseidon 24 Inch Pipeline in Ship Shoal Block 332. The force of the impact was so strong it dislodged the pipeline for nearly a mile and ripped the pipeline from the riser of a nearby platform. Approximately 2240 barrels of oil were spilled in the rupture. The pipeline was immediately shut-in and was not returned to normal operation until the completion of major repairs lasting nearly two months.

### b.   The Ewing Bank 873 Reservoir.

The pipeline damage caused several producing fields, including Ewing Bank Block 873 ("EW 873"), to be shut in for varying periods after the rupture. Marathon and Texaco held the mineral leases for EW 873,[2] and Marathon operated the property through a joint operating agreement with Texaco.[3]  EW 873 is located approximately 130 miles Southwest of New Orleans. Three reservoirs were produced from the platform at EW 873: the Bul 1 reservoir, the Tex-Mex reservoir, and the Chris S reservoir.[4]  All three reservoirs are partially water driven, meaning that the primary natural energy for the production of oil comes from an aquifer.

---

[1]   Four Transocean entities, Transocean Offshore (U.K.) Inc., Transocean Offshore Ventures Inc., Transocean Offshore U.S.A. Inc., and Transocean Deepwater Drilling Inc. (collectively "Transocean"), had some relationship to the Transocean 96 and are defendants in this case.

[2]   MMS lease for EW 873, portions of which are attached as Exhibit "A."

[3]   Unit Operating Agreement for EW 873, portions of which are attached as Exhibit "B."

[4]   Deposition of David Petro p.81, ln.23 - p.82, ln.21, attached as Exhibit "C"; Expert Report of Wayman Gore p.2, attached as Exhibit "D."

Twenty-four wells have been drilled into the Bul 1 and Tex-Mex reservoirs and four into the Chris S reservoir.[5] All produce into the EW 873 platform and from there into the Poseidon 24 inch pipeline.[6] EW 873 was shut-in for 23 days following the accident.

Because the reservoirs had water drive systems, oil in the reservoirs continued to be displaced through the sands during the shut-in period.[7] The influx of water pushed oil that would have been recoverable into an up-structure portion of the reservoir making it unrecoverable.[8] In addition, the water influx caused a change in the production characteristics of the reservoir because the water changed the relative permeabilities of the fluids in the reservoir.[9] As a result, water was produced preferentially to oil.[10] The abilities of the existing wells to produce oil was altered and the oil was lost for production purposes.[11] As a result, Marathon and Texaco have lost in excess of 1,290,000 barrels of oil and 1,078,000 mcf gas.[12]

---

[5]     Gore Report, p.2.

[6]     *Id.*

[7]     Petro Dep. p.438, ln.5 - p.439, ln.17.

[8]     Deposition of Wayman Gore, p.284, ln.9 - p.286, ln.5, attached hereto as Exhibit "E."

[9]     Gore Dep. p.245, ln.7 - p.246, ln.12.

[10]    Petro Dep. p.449, ln.11 - p.450, ln.15.

[11]    Petro Dep. p.449, ln.11 - p.450, ln.15, p.261, ln.24 - p.262, ln.14; Gore Dep. p.90, ln.3 - p.91, ln.20.

[12]    Gore Report, p.1 – 2.

II.   **Mr. Gore's testimony, qualifications, methodology, and analysis fully comport with the *Daubert* criteria.**

Certain standards apply regarding an expert who may offer scientific opinion testimony. The party seeking to have the expert admitted should demonstrate that the witness is qualified. The party should also show that the opinions are reliable, meaning that they are derived from valid or trustworthy scientific principles and methods. *Daubert*, 113 S. Ct. at 2795 and n. 9 (opinion must derive from the scientific method, *i.e.*, it must be "based on what is known"); *Moore v. Ashland Chemical, Inc.*, 151 F. 3d 269 (5th Cir. 1998) (en banc). Finally, the opinions should be relevant; that is, they should be helpful, which requires a valid scientific connection to the issue at hand. *Daubert*, 113 S. Ct. at 2795-96. Mr. Gore's testimony concerning the Claimants' reservoir damage and lost production meets all of these requirements.

Federal Rule of Evidence 702 provides for the admissibility of expert evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

It is undisputed that the matters considered by Mr. Gore are complex engineering, scientific, and technical issues and that expert assistance is therefore required and appropriate; after all, the defendants have retained two experts on these issues. The defendants also cannot even attempt to dispute that Mr. Gore is thoroughly qualified and experienced to assist the court in understanding the complex petroleum and reservoir engineering questions at issue in this case. Despite their rambling attacks on Mr. Gore's opinions, the defendants have never questioned his credentials or qualifications. And his curriculum vitae, which is attached as part of Exhibit "D," explains why – Mr. Gore and his firm are eminently qualified in his field. Accordingly,

defendants must attempt to claim that Mr. Gore's opinions do not meet the *Daubert* standard. But nothing could be further from the truth.

To determine whether an expert's proffered testimony communicates "scientific knowledge" the trial court assesses "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 113 S. Ct. at 2796. The trial court considers certain factors in determining whether an expert's testimony is based on reliable scientific knowledge: 1) whether the theory or method employed by the expert has gained general acceptance in the relevant scientific community; 2) whether the method has been subject to peer-review and publication; 3) whether the method employed can be and has been tested; and 4) whether the known or potential rate of error and the existence and maintenance of standards controlling the technique are acceptable. *Daubert*, 113 S. Ct. at 2796-97. The requirements of *Daubert* are to assure the Court that the proffered expert is suitably qualified and that his opinions or other testimony avoid unscientific speculation. Mr. Gore meets these tests.

## III.    Analysis

Mr. Gore is a Registered Professional Engineer with more than twenty years of experience[13] who has testified in numerous cases as an expert in five different courts and has never been rejected as an expert.[14] His educational and professional qualifications are extensive, and he estimates that his work on this case has exceeded more than 1200 man hours.[15]  While

---

[13]    Declaration of Wayman T. Gore, Jr. p.1, attached as part of Exhibit "D"; Gore Dep. p.9, ln.1 – ln.3.

[14]    Gore Declaration, p.1.

[15]    *Id.*

-6-

defendants use such terms as "knee jerk" to describe his work, the fact is that Mr. Gore has methodically and scientifically explored, analyzed, and documented Claimants' damages.

The defendants' appear to make two basic arguments – that Mr. Gore's methodology and opinions are "unreliable" and that Mr. Gore's opinions lack sufficient data or analysis.  These contentions will be addressed in turn.


a.    **Overview.**

Before responding to defendants' contentions, a brief overview of Mr. Gore's approach is helpful.  As outlined in detail in his expert report and his deposition, Mr. Gore has determined that water influx during the shut-in pushed recoverable oil past the highest wells and resulted in lost production,[16] partly from oil being pushed into the "attic" or updip portion of the reservoirs (such that the oil could no longer be recovered) and partly from changes in the production characteristics of the reservoirs (caused by changes in the relative permeabilities of the fluids in the reservoirs).[17]  Mr. Gore's analysis began when he observed that, contrary to his expectations, production volumes after the shut-in were significantly lower than before the shut-in.[18]  He compared that result to prior shut-ins and confirmed that no such decrease had occurred after the longest prior shut-in.[19]  He then began to examine available data to attempt to determine what might have caused the production decrease following the Poseidon shut-in.

---

[16]    Gore Report, p.7-9; Gore Declaration, p.1.

[17]    Gore Dep., p.229, ln.10 – ln.19.

[18]    Gore Report, p.3.

[19]    Gore Report, p.3-4.

Mr. Gore spent hundreds of hours analyzing the data that Marathon uses to operate its wells, and it became apparent that the continuing influx of water during the lengthy shut-in had significantly impacted productivity. Determining where those effects were most evident (in Lobes 10, 20, and 30 of the Bul 1 reservoir), identifying which wells showed the greatest impact (the A-15 and A-21 wells in the Bul 1 reservoir and the 963-1 well in the Chris S reservoir), and quantifying the impact took further analysis. As it became evident that the impact of the shut-in exceeded the production lost during the shut-in itself, it became necessary to decide whether to attempt to quantify that excess loss precisely or proceed with the original claim, which was conservative and clearly justified by Mr. Gore's analysis. The decision was made to maintain the conservative claim number and confirm the mechanism of the loss. That was done through analyzing the water cuts of the field as a whole and a number of specific wells, particularly the A-21 well.[20] Contrary to the defendants' assertions, Mr. Gore checked himself at each step of his analysis, and each step confirmed his conclusion that the shut-in caused reservoir damage and lost production.

**b.      Mr. Gore's Methodology and Opinions are Reliable.**

Defendants' contention that Mr. Gore's methodology and opinions are unreliable are directly rebutted by a review of applicable literature. For instance, Mr. Gore's analysis meets all applicable requirements of the problem well checklist set forth in Production Operations 2 by Allen & Roberts.[21] In the checklist, the authors have set forth various different steps that should

---

[20]     Gore Report, p.5-6.

[21]     Thomas O. Allen & Alan P. Roberts, Production Operations 2, 3rd Printing , see Checklist at p.8 – p.10, attached hereto as Exhibit "F."

be followed in evaluating and analyzing a problem well. Mr. Gore followed every applicable item on this checklist.[22] It is difficult to imagine how defendants can claim that Mr. Gore's methodology is flawed when he followed the very method suggested by the scientific literature.

Defendants specific allegations are rebutted below, but it is important to recognize certain basic defects in defendants' claims. One of the defendants' claims is that Mr. Gore's analysis was improper because he did not use the Marathon full-field simulation to attempt to quantify Claimants' damages in this case. This argument is fatally flawed for several reasons. First, Marathon has no model that is designed to represent the Poseidon shut-in. Marathon's reservoir model is a full-field model and as such is not designed to examine a specific field shut-in.[23] The full-field model does not incorporate certain key elements required to model flow in and around specific wellbores; parameters such as capillary pressure (hysteresis) data would be crucial to a model designed to look at reservoir damage/bypassed oil but have <u>not</u> been incorporated into the full-field model.[24] Defendants attempt to rely on conclusions resulting from a preliminary inquiry using the full-field simulation, but any contentions based on Marathon's "quick-look" model are erroneous because the existing Marathon reservoir model was not designed for (and is not appropriate for) a specific field shut-in analysis.[25]

The testimony of Marathon's reservoir engineer, David Petro, confirms that the existing model was not designed for the kind of analysis that Mr. Gore has undertaken to analyze the lost

---

[22]    Gore Declaration, p.2; *see also* Exhibit "F."

[23]    Declaration of David R. Petro, p. 2, attached hereto as Exhibit "G."

[24]    Petro Declaration, p.2.

[25]    Petro Declaration, p.2. *See* H.C. "Slip" Slider, <u>Worldwide Practical Petroleum Reservoir Engineering Methods</u>, pp.668-69. Different problems require different models, so it is important that "the engineer understands what is known and not known about the problem before a model is used." *Id.* at 669.

production claim.[26]  In addition, the existing Marathon model is not designed to measure the types of volumes at issue in this case.  Marathon only books approximately 75% of the reservoirs indicated by its reservoir model,[27] so the "margin of error" with the model (which predicts total production in excess of 100 million barrels) is very large.[28]  In other words, Marathon's existing model is not an appropriate tool for analyzing the effects of the shut-in, and the person who knows the model best, David Petro, acknowledges that despite defendants' misstatements to the contrary.

Defendants, and their experts, repeatedly refer to Marathon's reservoir model as an indication that Mr. Gore's analysis independent of the model was somehow improper, but that contention is refuted by the fact that the model was not designed for that type of use, as discussed above. Defendants also claim, however, that Marathon should have reconstructed its model to address the damages in the instant case, again attempting to cast doubt on the approach and methodology that Mr. Gore actually used.  However, it is critical for this Court to understand that Marathon's Ewing Bank 873 reservoir engineer, David Petro, testified that it took him over a year to perform the last revision of the model,[29] and the margin of error would still be so large as to make the results meaningless.[30]  In other words, even if all of that work had been undertaken by Marathon, defendants would now be claiming that the model is not sufficiently accurate. Finally, the defense expert who most strongly claims that Mr. Gore should have used a model,

---

[26]      Petro Declaration, p.2.

[27]      *Id.*

[28]      *Id.*

[29]      Petro Dep. p.227, ln.24 - p.228, ln.1.

[30]      Petro Declaration, p.2.

Calvin Barnhill, has testified that he has not constructed a model since graduate school, and has never used a model to form any opinions concerning reservoir damage.[31]

Defendants also contend that the methodology used by Mr. Gore is untested and unpublished.  To the contrary, however, Mr. Gore has followed all applicable steps on the problem well checklist methodology published by Allen & Roberts.[32]  In addition, Mr. Gore's decline analysis is consistent with Thompson & Wright[33] and his evaluation of the impact of the water cut increase is consistent with Timmerman.[34]  In other words, Mr. Gore's methodology is directly based on industry recognized methods.

In addition, Mr. Gore's work has been reviewed by both Marathon and Texaco; Mr. Petro (of Marathon) and Mr. Thornsberry (of Texaco) have both indicated that they have reviewed Mr. Gore's report and that they find his conclusions reasonable and supportable.[35]  In addition, as discussed above, the textbooks support Mr. Gore's methodology.  Finally, even the defendants' experts, Messrs. Bourgoyne and Barnhill, admit (at least to some degree) that Mr. Gore's methods are known methods.  In fact, Mr. Barnhill admits that he has not used a model to evaluate reservoir damage, that he is aware of instances in which the very events described by

---

[31]   Deposition of Calvin C. Barnhill, p.115 ln.16 – 23, attached as Exhibit "I."

[32]   *See, supra,* footnote 21.

[33]   Robert S. Thompson & John D. Wright, <u>Oil Property Evaluation</u>, 2nd Edition, p.5-17 (1984) ("With exponential decline, after the data is plotted on a piece of semilog paper, a straightedge is used to draw the best "eyeballed" curve through the data.  It is recommended that this be done by hand rather than by a least squares technique because spurious data points can be ignored and judgement can be applied.")

[34]   E.H. Timmerman, <u>Practical Reservoir Engineering</u>, Part II, Methods for Analyzing Output from Equations and Computers, p.118-119.

[35]   Deposition of Kevin L. Thornsberry, p.66, ln.18 – ln.22, attached as Exhibit "H."

-11-

Mr. Gore have occurred and resulted in lost production, and that he has used the same methodology as Mr. Gore in evaluating such loss of production claims.[36]

Finally, defendants attempt to claim that Mr. Gore has not ruled out alternative causes for the loss of production, but nothing could be further from the truth. Mr. Gore did check for other explanations, including checking well tests, recompletions, additional producing zones being plugged off, and checking for mechanical issues.[37] In doing so, he eliminated all but the shut-in as the cause of the lost production. In fact, it was Mr. Gore, not defendants' experts such as Mr. Bourgoyne, who examined well test graphs at similar choke sizes to be sure that he was using an "apples to apples" comparison, not just using unsubstantiated numbers.[38]

In some respects, the best way to respond to and refute the defendants' shotgun attack is just to identify the defendants' allegation and list the response as follows:

| Response: | Allegation: |
|---|---|
| 1.    Mr. Gore did make an "apples to apples" comparison of production before and after the shut-in – in contrast to the numbers relied on by Mr. Bourgoyne, Mr. Gore evaluated choke sizes and separately graphed well test pressures at different choke sizes.[39] | --  fails to make an "apples to apples" comparison of production before and after shut-in |
| 2.    Marathon's reservoir model is not designed for the purpose of measuring the loss sustained as a result of this casualty and cannot be used for that purpose. Key parameters such as capillary pressure are not in the model. Moreover, Marathon only books approximately | --  Marathon's own reservoir computer simulation did not show any loss outside the simulation's truncation error rate |

---

[36]     Barnhill Dep. p.101 ln.4 – p.103 ln.22, p.115 ln.16 – 23, p.147 ln.21 – p.151 ln.3.

[37]     Gore Dep., p.384, ln.14 – p.385, ln.17.

[38]     Gore Declaration, p.2.

[39]     Gore Declaration, p.2.

| | |
|---|---|
| 75% of its model results due to inherent error involved in modeling, so the loss resulting from the Poseidon shut-in, which is less than two percent of Marathon's total reserves, would not be expected to be within this margin of error.[40] | |
| 3.    The previous down trend in average daily production was a <u>decline caused by production</u> – but there was no production during the shut-in.   Therefore, there should be no decline in average daily production <u>unless</u>, of course, there was a loss in the reservoir because oil had migrated or been pushed up dip.  In contrast, during a similar shut-in during November, 1998, production returned at an increased rate after the shut-in period.[41] | -- assumes that average daily production rate would be the same or higher after the shut-in |
| 4.    Mr. Gore's opinions are fully supported by the textbooks and published literature.  As discussed at length above, Mr. Gore followed the checklist established by Allen & Roberts, and his opinions are extensively supported by various textbooks referenced below.   In addition, Mr. Gore and his firm have extensive experience analyzing thousands of wells' production streams annually in order to determine reserves and ultimate recovery.  Mr. Gore and his firm are retained by major oil and gas lending institutions to perform such studies (including Well Fargo Bank which is one of the five largest energy-lending institutions in the country).  Pollard, Gore & Harrison and its engineers are responsible for the reservoir engineering aspects of Well Fargo Bank's energy loan portfolio (approximately 200 individual loans valued at over $2 billion) as well as other banks and producer clients.  Reservoir engineering is Pollard, Gore & Harrison's business and they are a recognized | -- does not point to published studies or literature for support |

---

[40]     *Id.*

[41]     Gore Report, p.3-5; Gore Dep. p.288, ln.1 – p.289, ln.10.

| | |
|---|---|
| firm in their field of reserve and recovery analysis.[42] | |
| 5.    Mr. Gore did not rely on any short term analysis or short term results.  He examined and considered the full history of each and every well.  In addition, he looked at well test results covering the life of the field.  The well test graphs used by Mr. Gore in his analysis cover a two-year period (from January 1999 through December 2000).  Any implication that Marathon's reservoir engineer, David Petro, disagreed with Mr. Gore's approach is directly contradicted by Mr. Petro's deposition and his affidavit.[43] | -- relies on short term rather than long term production trends |
| 6.       Mr. Gore did consider the effects of correction factors and unrelated shut-ins.  The production numbers that he used were the same as those used by Marathon both before and after the shut-in and the comparison was therefore "apples to apples."  In addition, he concluded that the effects of unrelated shut-ins on the wells were negligible.   Mr. Gore considered this in his analysis and damages.[44] | -- failed to account for correction factors such as unrelated shut-ins |
| 7.    Mr. Gore's analysis was based on actual physical measurements so there was no statistical error involved in such measurements. Moreover, there is no requirement that a reservoir engineer perform a statistical error analysis as a prerequisite to forming an opinion concerning the existence of lost production. | -- did not perform a statistical error analysis |
| 8.    As explained above, Mr. Gore based his damages analysis on an ultra conservative approach that resulted in an easily obtainable volume and value for the minimum lost production.   As outlined in his report, Mr. | -- the calculation of damages is unrelated to water encroachment |

---

[42]        Gore Declaration, p.2-3.

[43]        Petro Dep., p.28 ln.17-24; Petro Declaration, p.3.

[44]        Gore Declaration, p.3.

| | |
|---|---|
| Gores' detailed analysis of the A-21 well indicates that production in excess of the amount claimed was lost from that well alone.[45] | |
| 9.      Various textbooks support Mr. Gore's analysis, including the problem well checklist by Allen & Roberts and <u>Oil Property Evaluation</u> by Thompson & Wright, <u>Practical Reservoir Engineering</u> by Timmerman, <u>Worldwide Practical Petroleum Reservoir Engineering Methods</u> by Slider, <u>Applied Petroleum Reservoir Engineering</u>, Second Edition, by Craft & Hawkins, <u>Petroleum Reservoir Engineering Physical Properties</u> by Amyx, Bass, & Whiting, <u>Fundamentals of Reservoir Engineering</u> by Dake, and <u>Reservoir Simulation</u> by Mattax & Dalton.   There is extensive support for Mr. Gore's approach and methodology, and that methodology has been used by the defendants' expert, Calvin Barnhill.[46] | -- cites no texts or published studies to support his results |

Ultimately, all of the principles relied on by Mr. Gore are industry standard and are based on basic petroleum reservoir engineering principles and supported by the textbooks.  In addition, Mr. Gore examined other potential causes and ruled them out.  Defendants' objection that Mr. Gore did not use the Marathon model makes no sense because it is apparent that the existing model was not designed for this type of damage analysis.  Moreover, Mr. Gore's method and opinions are based on actual measured data, data that has been collected daily by Marathon and since 1994 when the platform began producing.  In other words, the contention that Mr. Gore's methodology and analysis is not reliable is totally unsupported.

---

[45]      *Id.*

[46]      Gore Declaration, p.3; Barnhill Dep. p.147 ln.21 – p.151 ln.3.

c.      **Mr. Gore's Opinions are Supported by Sufficient Data and Analysis.**

The defendants also try to claim that Mr. Gore's testimony should be excluded because he "does not provide much information commonly relied upon by other experts in the field." Of course, this is not the test under *Daubert*; the test is whether Mr. Gore's opinions are supportable and would be of assistance to the court. In any event, however, there is certainly no requirement under *Daubert* that an expert opinion be based on complete information because if that were the test, most opinions would be excluded, particularly as respects petroleum and reservoir engineering where the data is, by nature, somewhat limited. Moreover, Mr. Gore does rely on extensive data, and the "unreliability" alleged by defendants is either illusory or relates to information that is unnecessary or nonessential. Again, the defendants' shotgun approach is best rebutted with a table outlining Claimants' responses to the issues they attempt to raise.

| Response: | Allegation: |
|---|---|
| 1.      Marathon has physical measurements of water production which evidence the water encroachment in various wells. Marathon also has run special tools into wells on EW 873 to measure the position of the water-front over time. Marathon has tested the wells to confirm water production and the amounts. All of this information has been reviewed and relied on by Mr. Gore. The continuation of water influx during a shut-in until equilibrium pressure is reached is a basic reservoir engineering principle. The equilibrium pressure was not reached during the 23-day Poseidon shut-in as confirmed by Mr. Gore based on measured pressure data during the shut-in.[47] | -- no engineering calculation of volume of water encroachment |

[47]      Gore Dep., p.238, ln.1 – p.239, ln.19.

| | |
|---|---|
| 2. Aquifer size is not a necessary component to the analysis of Mr. Gore. Mr. Gore confirmed the physical movement of the aquifer with production logs, water production, well tests, physical pressures measured during the shut-in, and the geological aspects of the reservoir, and each well in the reservoir, over a six-year time period leading up to the shut-in.[48] | -- no engineering calculation of actual aquifer size |
| 3. A detailed analysis of water encroachment in each well is not necessary to support Mr. Gore's opinions. With respect to water encroachment, Mr. Gore has analyzed each well in the reservoir system and has reviewed production logs, water production, well tests, physical pressures measured during the shut-in, and the geological aspects of the reservoir. He also reviewed each well in the reservoir over a six-year time period. Mr. Gore evaluated the physical producing characteristics of each well before and after the shut-in, and he conservatively estimated the lost production based on the conclusion that water encroachment in the A-21 well alone caused lost production in excess of the amount of damages being claimed.[49] | -- no engineering calculation of water encroachment for each well |
| 4. Mr. Gore has evaluated the producing characteristics before and after the shut-in for each producing well to determine the effect of production on displaced oil. The analysis (well test analysis, rate-time analysis, water-cut vs. cumulative oil analysis) indicates that the "by-passed" oil will not be recovered. | -- no evaluation of effect of production on displaced oil |
| 5. Mr. Gore has testified that each well on the platform has suffered some loss (however small) based on the fact that each well produces from a water-drive reservoir. When just one well is evaluated in detail, Mr. Gore's analysis indicates the damage to that well alone | -- no reliable analysis of volume of displaced oil in each well compared to overall production |

---

[48]     Gore Declaration, p.3.

[49]     *Id.*

| | |
|---|---|
| to be slightly greater than the value of the platform production volume for the shut-in period. A rate-time analysis for the A-21 well indicates that the difference in present value of two flow streams (with and without the shut-in) is approximately $33,000,000, while the value of the platform production is $30,000,000. In other words, as Mr. Gore testified, it is his opinion that the platform production value gives the court a conservative damage figure that is easily quantified.[50] | |
| 6.     Marathon only books approximately 75% of its model results due to inherent error involved in modeling, so the loss resulting from the Poseidon shut-in, which is less than two percent of Marathon's total reserves, would not be expected to be within this margin of error.[51] | -- Marathon and Texaco never revised their booked reserves |
| 7.     As discussed above (item 5), Mr. Gore has conservatively calculated damages because he has only looked to well(s), such as the A-21 well, where the data is conclusive.     This analysis still results in damages greater than (or equal) to platform production, which makes the value of platform production a conservative and easily quantifiable damage figure. | -- why is it reliable to extrapolate from certain areas of the system? |
| 8.     There are no wells in the Bul 1 – Lobe 10 Sand drilled in the "attic" portion of the reservoir that would recover the "bypassed" oil. As the water-front advances, the saturation of oil and water in the reservoir changes -- water saturation increases and oil saturation decreases. As this happens (as shown on the relative permeabilities curve and fractional flow curve used and described in Worldwide Practical Petroleum Reservoir Engineering Methods by Slider),[52] the ability of a well or a | -- why can't the displaced oil be recovered? |

---

[50]     Gore Declaration, p.3 – 4.

[51]     Id. at 2.

[52]     H.C. "Slip" Slider, Worldwide Practical Petroleum Reservoir Engineering Methods, pp.410-413.

| | |
|---|---|
| reservoir to flow oil in preference to water decreases. The flow preference becomes more and more water as the water-front approaches and passes wells. Therefore, oil production declines, water production increases, and individual wells have to be abandoned not allowing them to recover "attic" oil.[53] | |
| 9.    As previously discussed, a model is built for a specific purpose; a reservoir model, such as that used by Marathon, cannot be used for all purposes because results would not be reliable.   As noted in <u>Worldwide Practical Petroleum Reservoir Engineering Methods</u> by Slider, modeling requires that the problem be known in advance.[54] | -- why didn't Mr. Gore just rely on Marathon's reservoir model? |
| 11.    When similar well-test results are compared it demonstrates that the producing ratio of water to oil did not initially decrease after shut-in.[55]    Also, it is important to remember that one cannot rely on just a few days to base one's conclusion; the overall trend must be considered – which is what Mr. Gore did. | -- why did the A-21 well's water ratio appear to decrease after the initial shut-in? |
| 12.    The effect of water was so minimal that discontinuing water injection had no effect.[56] | -- what was the effect of discontinuing water injection? |
| 13.    See comments in item (8) above. Also, Mr. Gore's calculations show a loss in <u>ultimate</u> recovery indicating no make-up possible.[57] | -- why doesn't it just take longer to produce? |
| 14.    Overboard water did not affect well A-21.   Mr. Gore concluded that the effect of downtime on the A-21 well (and other wells) | -- no calculation of the effect of overboard water discharge |

---

[53]       Gore Declaration, p. 4.

[54]       H.C. "Slip" Slider, <u>Worldwide Practical Petroleum Reservoir Engineering Methods</u>, p.669.

[55]       Gore Dep., p.176, ln.14 – p.177, ln.8.

[56]       Petro Declaration, p.2-3; Petro Dep., p.109, ln. 3-12.

[57]       Gore Declaration, p.2.

| | |
|---|---|
| downtime on the A-21 well (and other wells) was negligible.[58] | |
| 15.     The economic limit is based on water-cuts of approximately 80%.  This limit is based on actual field history.  The economic limit is not a necessary component when considering two flow streams (before and after shut-in) because the limit is the same in each case.  The key issue is the differential, and the differential will not change.[59] | -- an explanation of factors affecting economic limit |
| 16.     There was a significant increase in pressure during the shut-in compared to the pressure anticipated by the model, and the pressure was still increasing when the pipeline came back on line indicating that pressure equalization within the reservoirs had not occurred.[60] | -- why no significant increase in pressure during or after shut in? |

Ultimately, the defendants' arguments boil down to the fact that their experts disagree with some of the conclusions reached by Mr. Gore.  Such disagreements, however, are not a basis for a *Daubert* challenge.  Instead, these disagreements will be issues that the Court will need to resolve; but the Court cannot fairly resolve such issues without hearing both sides of the issues.

**d.     The Testimony of David Petro Does Not support Defendants' Arguments.**

Defendants attempt to rely on statements by David Petro to support their contention that Mr. Gore's testimony should be excluded because he failed to use Marathon's reservoir simulation as a basis for his damages calculations.  Mr. Petro, however, does not believe that Mr.

---

[58]     Gore Dep., p.162, ln.5 – p.165, ln. 15.

[59]     Gore Declaration, p.4.

[60]     *Id.*

Gore should have used the Marathon simulation to calculate damages in this case.  As discussed above, Marathon's existing reservoir simulation was not designed to measure Marathon's damages in this case, and Mr. Petro agrees that use of his model for that purpose would be inappropriate.[61]  To begin with, Marathon only books approximately 75% of the reserves shown on its model.[62]  The remaining 25% is more than 20 times the quantity of lost production claimed in this case.  Therefore, Marathon's "reserve books" already include a margin of error that incorporates this loss.

Defendants also attempt to rely on Mr. Petro's testimony to support their contention that Mr. Gore used inappropriate short term data rather than relying on longer trends.  In fact, however, Mr. Petro's comments related to changing the Marathon simulation results, which are already reduced by 25% as respects booked reserves.[63]  Mr. Petro did not disagree with the information that Mr. Gore relied on or Mr. Gore's conclusions.

## III.    Conclusion

Based on Mr. Gore's extensive work in this case, his report, and his deposition, there can be no question that Mr. Gore's opinions meet the *Daubert* standard.  While the defendants attempt to portray the opinions as "knee jerk" science, it becomes evident with a review of his work that Mr. Gore has taken an analytical, scientific approach to this case and that it would be completely counter to *Daubert* to exclude his testimony.  Defendants' experts may not like some

---

[61]    Petro Declaration, p.2.

[62]    Gore Declaration, p. 2; Petro Declaration, p.2.

[63]    Petro Declaration, p.2.

of his conclusions, which is why this motion has been filed, but those are issues to be resolved at trial. Accordingly, the defendants' motion to strike the testimony of Mr. Gore should be denied.

Respectfully submitted,

Donald R. Abaunza (Bar #2273), T.A.
William W. Pugh (Bar #10898)
Brett D. Wise (Bar #24711)
LISKOW & LEWIS
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana  70139-5099
Telephone:  (504) 581-7979

Attorneys for Marathon Oil Company and Texaco Exploration and Production Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been served upon all counsel of record by hand delivery or by facsimile and by placing same in the United States mail, properly addressed and postage prepaid, this _30th_ day of October, 2002.

SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED